# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| NICOLE ARMBRUSTER, | ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | )    Civil Action No. 12-1584 (ABJ) |
| OFC. ERIC FROST, *et al.*, | ) <br> ) |
| Defendants. | ) <br> ) |

## MEMORANDUM OPINION

Plaintiff Nicole Armbruster has brought this action against Metropolitan Police Officer Eric Frost, in his individual capacity, and the District of Columbia. Compl. [Dkt. # 1] ¶¶ 2–3. Her complaint alleges three causes of action arising from injuries that she allegedly suffered during her arrest while participating in a protest. Count I asserts an assault and battery claim against both Officer Frost and the District of Columbia. *Id.* ¶¶ 34–39. The two remaining counts assert 42 U.S.C. § 1983 claims against Officer Frost on the grounds that he used excessive force against plaintiff during the arrest in violation of the Fourth Amendment (Count II) or, alternatively, the Fifth Amendment (Count III). *Id.* ¶¶ 40–48. Defendants have moved for summary judgment under Federal Rule of Civil Procedure 56 on the grounds that the force that Officer Frost used against plaintiff was "not clearly unreasonable." Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") [Dkt. # 8] at 7; Defs.' Mot. for Summ. J. [Dkt. # 8]. The encounter was captured on videotape, and based upon its review of the tape, the Court will grant defendants' motion for summary judgment on all three counts.

## BACKGROUND

The complaint sets out plaintiff's account of the events of April 21, 2012, when she participated in a protest against the World Bank and the International Monetary Fund. Compl. ¶ 7; Armbruster Decl. [Dkt. # 11-4] ¶ 3. Plaintiff alleges that after the protest, she saw that a fellow protestor, Nancy Munoz Wolfson, had stopped walking and was standing in the street. *Id.* ¶¶ 7–8. Plaintiff states that she approached Ms. Munoz Wolfson, reached a hand toward her, and said: "Come on, let's go." *Id.* ¶ 8. She goes on: "At that point, approximately seven MPD officers surrounded the two women and pulled the two women apart." *Id.* ¶ 9. According to plaintiff, several of the police officers, including Metropolitan Police Officer Frost, "grabbed" her and pulled her over to the side of a car. *Id.* ¶ 10.

The complaint alleges that "without warning," Officer Frost "then slammed Ms. Armbruster's face into the hood of the car." *Id.* ¶ 11. It claims that after she "had been bent over the hood of the car for approximately ten second[s], not moving, Officer Frost, without warning, assisted by one or more other officers, threw Ms. Armbruster to the ground, causing cuts and bruises to her face and bruises to her knee." *Id.* ¶ 18; *see* Armbruster Decl. ¶ 3. Once plaintiff was on the ground, Officer Frost allegedly placed his knee on her torso and leaned into her, causing plaintiff "to be unable to breathe and also causing her severe pain." Compl. ¶ 19.

Plaintiff asserts that when Officer Frost "slammed" her face into the hood of the car, threw her on the ground, and placed his knee on her torso, she: (1) "was already securely within Officer Frost's grasp"; (2) "was not resisting"; (3) "was neither escaping nor attempting to escape"; (4) "posed no threat to property or anyone's safety"; (5) "was neither touching nor attempting to touch any of the officers who were present"; and (6) "made no aggressive gestures or words and was not in a fighting stance." *Id.* ¶¶ 12–17, 20–25; *see* Armbruster Decl. ¶ 5. Plaintiff also alleges that at the time of the arrest, she was particularly vulnerable to pain in her

pelvis and abdominal area as a result of recent surgeries, and that Ms. Munoz Wolfson repeatedly told Officer Frost and the other officers that plaintiff was sick and that they were treating her too roughly. Compl. ¶¶ 29–30.

At the end of the encounter, Officer Frost arrested plaintiff. *Id.* ¶ 31. After her arrest, plaintiff was taken to Sibley Memorial Hospital "due to the pain and injuries she suffered as a result of Officer Frost's use of force against her." *Id.* ¶ 28. Plaintiff was charged with a violation of D.C. Code § 22-405(b),[1] but the charge was subsequently dismissed pursuant to a deferred prosecution agreement. *Id.* ¶ 32.

On September 24, 2012, plaintiff filed this three count complaint against Officer Frost and the District of Columbia. Count I is an assault and battery claim against both defendants. *Id.* ¶¶ 34–39. She also brings a 42 U.S.C. § 1983 claim against Officer Frost, in his individual capacity, on the grounds that he used excessive force in effecting her arrest in violation of the Fourth Amendment (Count II) or the Fifth Amendment (Count III). *Id.* ¶¶ 3, 40–48.

On November 9, 2012, during the initial scheduling conference for this case, counsel for plaintiff informed defendants and the Court that there were video recordings depicting the events in question. Plaintiff provided the recordings to the defense. *See* Defs.' Mem. at 3. On February 13, 2013, defendants then moved for summary judgment in reliance upon that evidence, and they supplied the recordings to the Court. *See* Defs.' Mem. at 4; Ex. I to Defs.' Mot. for Summ. J. [Dkt. # 9]. Plaintiff does not allege that the recordings were altered in any

---

1     D.C. Code § 22-405(b) (2001) provides:

> Whoever without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor and, upon conviction, shall be imprisoned not more than 180 days or fined not more than the amount set forth in § 22-3571.01, or both.

3

way, and she does not contend that what they depict differs from what actually happened. Indeed, her opposition to defendants' motion also relies on the same material. *See* Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J ("Pl.'s Opp.") [Dkt. # 11] at 2–8.

The video recordings quite clearly contradict plaintiff's version of the story. They demonstrate that Ms. Munoz Wolfson, who plaintiff claims had merely "stopped walking and was standing in the street," Compl. ¶ 8, was actually being restrained by police and was physically in their custody. Video 2 at 0:21–:22; *see also* Video 1 at 0:06–:12. Plaintiff walked into the center of the street where Ms. Munoz Wolfson was being detained and began pulling Ms. Munoz Wolfson towards her while two police officers attempted to hold on. Video 3 at 0:06–:08. Additional officers intervened to separate the women. Officer Frost extricated plaintiff from the fray, and both he and plaintiff fell backwards onto the hood of the car. Video 2 at 0:27–:30. Officer Frost stood up and pulled plaintiff off the car, keeping her hands behind her back in what appears to be an attempt to prevent her from interfering again with Ms. Munoz Wolfson's detention. *Id.* at 0:31–:32. While the complaint characterizes plaintiff as docile and cooperative, the tapes show that she struggled with and tried to escape from Officer Frost throughout the encounter. Once she was fully upright, plaintiff immediately jerked herself away from Officer Frost and moved toward Ms. Munoz Wolfson. *Id.* at 0:32–:33; Video 1 at :20–:21. At that point, Officer Frost pulled plaintiff completely free of Ms. Munoz Wolfson, and placed her over the hood of the car. Video 2 at 0:33–:34.

Further, contrary to plaintiff's assertions, she was not lying still on the car when Officer Frost moved her to the ground. *See* Armbruster Decl. ¶ 4. The videos show that after Officer Frost secured plaintiff over the hood of the car, she reared up, raised her head and shoulders off the car, and propped herself up on her elbows. Video 2 at 0:36. After he pressed plaintiff back

onto the car to subdue her again, Officer Frost pulled her left arm down to her lower back and reached his other arm around his back to retrieve his handcuffs. Video 2 at 0:38; Video 1 at 0:28–:29. Meanwhile, plaintiff used her free arm to again push herself off of the hood of the car. Video 1 at 0:29–:31. She wrenched her other arm out of Officer Frost's grip, turned around, and pitched herself forward toward Ms. Munoz Wolfson and into the middle of the group of officers. *Id.* at 0:32–:33. The surrounding officers, including Officer Frost, caught plaintiff's arms while she was propelling herself forward and then brought her to the ground. *Id.* at 0:35–:46. One officer secured her right arm, and Officer Frost placed his knee over her left arm and onto her back while using his hands to handcuff her. Video 3 at 0:44–:51. Although the videos provide obstructed views of the handcuffing and moments following, one can observe that plaintiff was able to stand up and walk with Officer Frost without any difficulty immediately after she was handcuffed. Video 2 at 1:16–1:18; Video 3 at 1:03–1:10.

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual disagreement is insufficient to preclude summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); a dispute is "genuine" only if a reasonable fact-finder could find for

the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *see Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

But in a case where the court has the benefit of video evidence, the Supreme Court has stated that courts deciding summary judgment motions should "view[] the facts in the light depicted by the videotape," and that they need not rely on "visible fiction" when the non-moving party's version of events is "so utterly discredited by the record that no reasonable jury could have believed [it]." *Scott*, 550 U.S. at 380–81. Therefore, Court will decide defendants' motion for summary judgment based on the events as depicted in the video recordings.

## ANALYSIS

I. **Section 1983 Claims**

   A. <u>The Court will dismiss Count III because plaintiff's Section 1983 claims must be analyzed under the Fourth Amendment and not the Fifth Amendment.</u>

Since the Court's jurisdiction is predicated upon the federal claims, the Court will consider those counts first. Counts II and III both assert Section 1983 claims on the grounds that Officer Frost used excessive force against plaintiff during her arrest. Count II alleges that Officer Frost's alleged use of excessive force violated the Fourth Amendment. Compl. ¶¶ 41–44. Count III explains that "[i]f some or all of Ms. Armbruster's injuries are not cognizable under the Fourth Amendment because her arrest had ended and her pretrial detention had begun at the time that Officer Frost used excessive force against her, Ms. Armbruster's claims are alternatively cognizable under the Fifth Amendment." *Id.* ¶ 46.

6

The Fourth Amendment's prohibition on unreasonable searches and seizures encompasses the right to be free from the use of excessive force during an arrest, investigatory stop, or any other seizure. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Fifth Amendment's Due Process Clause protects a pretrial detainee from the use of excessive force. *Id.* at 395 n.10. The Supreme Court has "not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins." *Id.*

Here, plaintiff's Section 1983 claim is based upon Officer Frost's alleged use of excessive force during the period leading up to her arrest. *See* Compl. ¶¶ 11–31. "[C]laims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395. Therefore, the Court will analyze plaintiff's Section 1983 claim under the Fourth Amendment's "reasonableness" standard and dismiss plaintiff's Fifth Amendment claim (Count III).

  B. <u>The Court will grant defendants' motion for summary judgment on Count II because Officer Frost did not use excessive force against the plaintiff in violation of the Fourth Amendment, and he is therefore entitled to qualified immunity.</u>

  a. *The standard for qualified immunity*

In Count II, plaintiff alleges that Officer Frost violated her Fourth Amendment rights by using excessive force in effecting her arrest, Compl. ¶¶ 40–44, and she seeks money damages under 42 U.S.C. § 1983, *id.* ¶ 8. Defendants counter that Officer Frost is entitled to judgment as a matter of law because he is protected by qualified immunity. Defs.' Mem. at 7. Section 1983 creates a private cause of action against a person who violates an individual's constitutional rights while acting "under color of any statute, ordinance, regulation, custom, or usage, of any

State . . . or the District of Columbia." 42 U.S.C. § 1983. But a plaintiff may not recover under Section 1983 if the defendant is entitled to qualified immunity. *See Scott*, 550 U.S. at 376.

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted). Since the immunity exists to shield government officials who act lawfully from the rigors of suit, it should be granted or denied as early as the factual record allows. *Id.* Accordingly, it is appropriate to terminate actions on the basis of immunity "on a properly supported motion for summary judgment." *Butz v. Economou*, 438 U.S. 478, 508 (1978). In light of the video recordings, the Court finds that there is no genuine dispute of material fact in this case, and that summary judgment is the appropriate forum to resolve Officer Frost's qualified immunity defense as a matter of law. *See Scott*, 550 U.S. at 381, n.8 ("At the summary judgment stage, however, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [the police officer's] actions . . . is a pure question of law.") (internal cross-reference omitted).

The defendant bears the burden of pleading and proving the defense of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, -- U.S. --, 131 S.Ct. 2074, 2080 (2011), quoting *Harlow*, 457 U.S. at 818; *see Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). In each case, the court may decide which prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In a case where the question of whether the official violated a constitutional

right is easily decided, deciding that question first is the "better approach." *Scott*, 550 U.S. at 377 n.4.

### b. Officer Frost is entitled to qualified immunity because he did not use excessive force against plaintiff in violation of the Fourth Amendment.

Police officers have the authority "to use some degree of physical coercion or threat thereof" in making an arrest. *Graham*, 490 U.S. at 396. "'[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* at 396 (citation omitted). The "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at 202. In determining whether an officer's use of force was reasonable, the court must consider various case-specific factors including: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396–97. As such, the reasonableness of a particular use of force must be judged from the viewpoint of a reasonable officer on the scene. *Rogala v. District of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998) (internal quotation marks omitted). A defendant's motion for summary judgment on a Section 1983 claim alleging excessive force "is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993), citing *Martin v. Malhoyt*, 830 F.2d 237,

253–54 (D.C. Cir. 1987); *see also Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011), quoting *Wardlow*, 1 F.3d at 1303.

Plaintiff asserts that Officer Frost used excessive force when he "slammed her into the hood of the car." Pl.'s Opp. at 4; Compl. ¶ 41. But plaintiff's choice of vocabulary is not borne out by the video, and what the evidence does show is that she was actively resisting the officer's efforts to restrain her and to keep her from interfering with another arrest. Therefore, the limited amount of force that was used was reasonable under the circumstances, and the force used in this case did not exceed – or even come close to – the physical coercion contemplated in *Graham*.

Plaintiff's interaction with Officer Frost began when she interjected herself into ongoing proceedings and attempted to pull her friend away from several police officers. Video 3 at 0:06–:08. After Officer Frost separated plaintiff from her friend, he held her arms and attempted to keep her from interfering with the detention of Ms. Munoz Wolfson again. Video 2 at 0:30–:33. Plaintiff continued to struggle, attempted to escape Officer Frost's grip, and tried to reach her friend. Video 2 at 0:30–:33. It was only at that point that Officer Frost placed plaintiff on the hood of the car in an attempt to maintain control over her. Video 2 at 0:33–:35. Even after Officer Frost placed plaintiff on the car, she attempted to get up again, and he had to push her back down. Video 2 at 0:35–:37.

The events happened quickly; the video footage shows that approximately fourteen seconds elapsed from the time the police first had Ms. Munoz Wolfson in their grasp – before plaintiff began to interfere – until Officer Frost placed plaintiff on the hood of the car. Video 2 at 0:21–:35. As defendants note, plaintiff had no right to physically interfere with her friend's arrest, Defs.' Mem. at 10, and even plaintiff acknowledges that such interference would have constituted a violation of D.C. Code § 22-405(b), which was the eventual charge. *See* Pl.'s Opp.

at 12. In this rapidly developing situation, where plaintiff was interfering with an arrest and resisting police custody, it was objectively reasonable for Officer Frost to quickly and forcefully place her on the hood of the car to maintain control over her. *See Stevens v. Stover*, 727 F. Supp. 668, 671 (D.D.C. 1990) (holding that an officer's use of force against a plaintiff was objectively reasonable considering the force the plaintiff herself exercised in resisting police custody). It was also reasonable for Officer Frost to believe plaintiff posed a threat to officer safety or to the safety of others. *See Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 22 (D.D.C. 2011); *see also Robinson v. District of Columbia* Nos. 03-1455, 03-1456(RCL), 2006 WL 2714913, at *4–5 (D.D.C. Sept. 22, 2006) (entering summary judgment on qualified immunity grounds even where the plaintiff did not resist arrest or attempt to flee, the arresting officer "shoved" the plaintiff on the hood of a car, and the handcuffs were so tight that plaintiff suffered swelling and abrasions; the court noted that plaintiff was not beaten, shot, or permanently injured).[2]

Plaintiff further alleges that once she was "completely subdued" on the hood of the car "and could easily have been handcuffed," Officer Frost instead decided, "for no legitimate reason, to rough [her up] some more," and "threw" her to the ground, causing bruises on her face and knee. Pl.'s Opp. at 4; Compl ¶ 18. This allegation is so "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380. The video recordings

---

2   Although plaintiff was treated for injuries at Sibley Memorial Hospital after her arrest, Pl.'s Opp. at 8, the only information she provides about her injuries are three photos of minor bruising on her face and one photo of the cracked lens of her glasses. *Id.* at 7; Armbruster Decl. ¶ 7 ("The photographs are a fair and accurate representation of my injuries and my broken glasses."). While she claims that Officer Frost's placement of his knee onto her back left her unable to breathe, Pl.'s Opp. at 8; Armbruster Decl. ¶ 9, there is no indication that she received medical care for any injury resulting from his doing so, or that she suffered any permanent or ongoing injury. *See Wardlaw*, 1 F.3d at 1304 & n.7 (noting that while the absence of a severe injury "is not by itself the basis for deciding whether the force used was excessive, it does provide some indication" that the degree of force was reasonable). And the recordings show that plaintiff was able to walk on her own power without difficulty as soon as she was back on her feet.

show that after Officer Frost put plaintiff on the car, he held her with one hand and reached around to his back, with his other hand, to get his handcuffs. Video 2 at 0:38; Video 1 at 0:28–:29. While Officer Frost was reaching for his handcuffs, plaintiff pushed herself off the hood of the car, freed herself from Officer Frost's grip, turned around, and pitched herself forward toward Ms. Munoz Wolfson. Video 1 at 0:29–:33. The surrounding officers, including Officer Frost, caught her arms while she was propelling herself forward and brought her to the ground. *Id.* at 0:35–:46. One officer secured plaintiff's right arm, and Officer Frost placed his knee over her left arm and onto her back while using his hands to handcuff her. Video 3 at 0:44–:51.

By the time plaintiff was pinned to the ground, she had lunged, rotated, and jerked herself away from Officer Frost three times. Since Officer Frost had not been able to subdue or handcuff plaintiff by placing her on the hood of the car, it was reasonable for him to conclude that he needed to take additional action to restrain plaintiff, such as placing her on the ground. *See Scott v. District of Columbia*, 101 F.3d 748, 759 (D.C. Cir. 1996) (stating that after the plaintiff attempted once to escape from custody, the officer "could reasonably conclude at that point that he needed to place [the plaintiff] in restraints, to prevent him from escaping a second time").

Plaintiff argues that even if she had been struggling while being placed on the ground, the video evidence is clear that she was not resisting or even moving after being placed on the ground, so there was no reason for Officer Frost to place his knee on her back. Pl.'s Opp. at 13. In light of Officer Frost's prior experience with plaintiff's attempts to escape custody, it was reasonable for him to believe that he needed to use some other part of his body to hold her down while using both of his hands to handcuff her. In that context, pushing his knee over her left arm and onto her back was not an excessive use of force. It is true that at the time Officer Frost

12

placed his knee on plaintiff's back, she was already being restrained by two other officers. But that does not make Officer Frost's actions unreasonable because plaintiff had managed to escape the grip of multiple officers earlier during the encounter. *See Scott*, 101 F.3d at 759–60 (holding that officers knocking the plaintiff to the ground, rolling him over, and pinning him with their knees on his neck, back and legs so he could be handcuffed did not constitute excessive force and noting that the plaintiff's offer to return to custody after his escape attempt "did not eliminate the need for force").

The Court of Appeals has upheld the use of similar force – and even greater degrees of force – in other cases. *See Oberwetter*, 639 F.3d at 548, 555 (no excessive force when the officer damaged uncooperative plaintiff's earphone, shoved her against a pillar, and violently twisted her arm); *Rogala*, 161 F.3d at 54–55 (no excessive force where the officer pulled the plaintiff out of a car, bruising her arm, hitting her head against the car, and causing a black eye); *Wardlaw*, 1 F.3d at 1300, 1304 (no excessive force where a marshal punched the plaintiff who was interfering with an arrest once in the jaw and two or three times in the chest); *Martin*, 830 F.2d at 262 (no excessive force where the officer threw the plaintiff into a car, slammed the door on one of his legs, and grabbed his arms and pulled them behind his back). Other decisions in this district also support a finding of qualified immunity in this case. *See Steele v. D.C. Hous. Auth.*, No. Civ.A. 02-1420 CKK, 2006 WL 335770, at *7 (D.D.C. Feb. 14, 2006) (no excessive force where the officer twisted the plaintiff around and slammed him up against the wall); *Gee v. District of Columbia*, Nos. Civ. 04-1797 RJL, Civ. 04-2042 RJL, 2005 WL 3276272, at *3 (D.D.C. Aug. 22, 2005) (no excessive force where the officers twisted the plaintiff's arm behind his back and bent his neck forward, causing injuries to his back, neck, genitals, arm, and head). In light of these cases, a reasonable officer on the scene could have believed that securing

plaintiff quickly and forcefully on the hood of the car and then the ground was reasonable and lawful.

Plaintiff maintains nonetheless that Officer's Frost placement of his knee onto her back was "very intrusive" and "vastly disproportionate to any legitimate law enforcement need" because it caused her to be unable to breathe for twenty seconds. Pl.'s Opp. at 11, 14. She argues that this intrusion was particularly dangerous because it could have caused her to asphyxiate. Pl.'s Opp. at 11. The cases that plaintiff cites to support this proposition are distinguishable. In *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 370–71, the arrestee died of positional asphyxia after he had been placed in a headlock with another person on top of him for ten minutes, and then handcuffed and left on the floor face down for an additional five minutes. In *Arce v. Blackwell*, 294 F. App'x 259, 260–61 (9th Cir. 2008), the arrestee died of positional asphyxiation after police officers kept him restrained with his chest to the ground while applying pressure to his back and ignoring pleas that he could not breathe. In *Drummond v. City of Anaheim*, 343 F.3d 1052, 1055, 1061 (9th Cir. 2003), the plaintiff fell into a "permanent vegetative state" after two officers allegedly crushed him "against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance."

Officer Frost's use of force does not come close to what happened in those cases. Here, Officer Frost had his knee on plaintiff's back for about twenty seconds while placing her in handcuffs. Video 2 at 0:53–1:10. Officer Frost did not keep his knee on her back a moment longer than necessary; as soon as he handcuffed plaintiff, he immediately got up and helped plaintiff to her feet. Video 3 at 1:04; *see also* Video 2 at 1:09–:16. After plaintiff got up, she was able to walk away with the officer. Video 3 at 1:03–:10. Further, plaintiff has not alleged

14

that she told the officers that she was unable to breathe while she was being handcuffed, nor has she alleged that she complained about respiratory issues after she was placed back on her feet. Although plaintiff was taken to the emergency room, Pl.'s Opp. at 7, her injuries were limited to minor bruising on her face and damaged glasses; she has not alleged that she continues to suffer from any permanent or serious injuries as a result of the arrest.

For the reasons stated above, plaintiff has not shown that Officer Frost violated her Fourth Amendment rights by using excessive force during her arrest. Therefore, Officer Frost is entitled to qualified immunity on the Section 1983 claim, and the Court will grant his motion for summary judgment on Count II. *See Gee*, 2005 WL 3276272, at *2 ("If there was no [constitutional] violation, the plaintiff's claim lacks merit under [Section] 1983 and should be dismissed without further inquiry into qualified immunity.").

## II. Assault and Battery Claims

A. The Court will exercise supplemental jurisdiction over plaintiff's common law claim.

Because the basis for federal jurisdiction has fallen away after dismissal of the Section 1983 claims, the Court must decide whether to retain supplemental jurisdiction over plaintiff's common law claims of assault and battery. *See* 28 U.S.C. § 1367. In deciding whether to exercise supplemental jurisdiction, the "court must first determine whether the state and federal claims derive from a common nucleus of operative fact." *Konah v. District of Columbia*, 815 F. Supp. 2d 61, 78 (D.D.C. 2011), citing *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 920 (D.C. Cir. 1996). If so, "the court then must decide whether to exercise its discretion to assert jurisdiction over the state claim." *Id.* at 78–79. In making this determination, the court must weigh factors of judicial economy, convenience, fairness, and comity. *Edmonson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265–66 (D.C.

Cir. 1995). However, if a state claim raises a "novel or complex issue of state law," the court may decline to exercise its supplemental jurisdiction. *Konah*, 815 F. Supp. 2d at 79.

Here, plaintiff's federal and state claims derive from a common nucleus of operative fact: Officer Frost's use of force in arresting her. *See* Compl. ¶¶ 34–48. Moreover, judicial economy, fairness, and convenience weigh in favor of the Court retaining jurisdiction over the assault and battery claim because the analysis regarding whether an officer committed assault and battery is "similar to the excessive force standard applied in the Section 1983 context." *Dormu*, 795 F. Supp. 2d at 28 (internal quotation marks and citation omitted); *see also Konah*, 815 F. Supp. 2d at 79 (exercising supplemental jurisdiction over plaintiff's assault and battery claims when all of her claims arose from the same incident). Hence, the Court will retain its supplemental jurisdiction over plaintiff's common law claims.

B. <u>The Court will grant defendants' motion for summary judgment on the assault and battery claims because Officer Frost did not use excessive force to effect plaintiff's arrest.</u>

Plaintiff alleges that Officer Frost assaulted and battered her when he "intentionally and unlawfully attempt[ed] to physically harm [plaintiff] by slamming her face into the hood of a car" and by "throw[ing plaintiff] to the ground and forc[ing] his knee into her torso." Compl. ¶¶ 35–36. She further alleges that the District of Columbia is liable for Officer Frost's actions under the doctrine of *respondeat superior*. *Id.* ¶ 39.

In the District of Columbia, an assault is "'an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim.'" *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007), quoting *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993). A battery is "'an intentional act that causes a harmful or offensive bodily contact.'" *Id.*, quoting *Etheredge*, 635 A.2d at 916. "Under the doctrine of respondeat superior the District of Columbia is liable for the torts of its police officers acting under the scope of their

employment." *District of Columbia v. White*, 442 A.2d 159, 162 n.7 (D.C. 1982); *see Evans-Reid*, 930 A.2d at 937 ("The District is vicariously liable for the intentional and negligent acts of its officers acting within the scope of their employment.").

"[A] police officer is privileged to use force so long as the 'means employed are not in excess of those which [he] reasonably believes [are] necessary.'" *Dormu*, 795 F. Supp. 2d at 27 (second and third alterations in original), quoting *Etheredge*, 635 A.2d at 916. In fact, "an officer may commit what at common law would be an assault unless 'the threatened use of force is clearly excessive.'" *Rogala*, 161 F.3d at 57, quoting *Jackson v. District of Columbia*, 412 A.2d 948, 956 (D.C. 1980). The inquiry into whether the officer used excessive force is made from the perspective of a reasonable officer on the scene. *Dormu*, 795 F. Supp. 2d at 28. Thus, this standard for analyzing an assault and battery claim against an officer is "'similar to the excessive force standard applied in the Section 1983 context.'" *Id.*, quoting *Rogala*, 161 F.3d at 57.

Because the Court finds that Officer Frost did not use excessive force in effectuating plaintiff's arrest, it also holds that he is not liable for assault and battery. *See Rogala*, 161 F.3d at 57 (dismissing an assault and battery claim because the court had found that the officer did not use excessive force for purposes of the plaintiff's Section 1983 claim). Since Officer Frost did not commit a tort against plaintiff, the District of Columbia cannot be liable for assault and battery under the doctrine of *respondeat superior*. Therefore, the Court will grant defendants' motion for summary judgment on Count I.

## CONCLUSION

For the reasons stated above, the Court will grant defendants' motion for summary judgment on all counts. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: August 26, 2013